791 S.E.2d 305

**ARKAY, LLC and Robert R. Knoth, Respondents,**

v.

**CITY OF CHARLESTON, City of Charleston Board of Zoning Appeals, Andrew Pinckney Inn, and Michael A. Molony, Appellants.**

**Appellate Case No. 2014–001466**
**Opinion No. 5419**

Court of Appeals of South Carolina.

Heard January 13, 2016
Filed June 29, 2016
Rehearing Denied October 27, 2016

Charlton de Saussure, Jr., of Haynsworth Sinkler Boyd, P.A., and Frances Isaac Cantwell, both of Charleston, for Appellants City of Charleston and City of Charleston Board of Zoning Appeals; Wilbur E. Johnson, of Young Clement Rivers, LLP, of Charleston, for Appellant Andrew Pinckney Inn; and Thomas S. Tisdale, Jr., of Hellman Yates & Tisdale, P.A., of Charleston, for Appellant Michael A. Molony.

Capers G. Barr, III, of Barr, Unger & McIntosh, LLC, of Charleston, for Respondents.

WILLIAMS, J.:

In this zoning case, the City of Charleston (the City), the City of Charleston Board of Zoning Appeals (the Board), the Andrew Pinckney Inn, and Michael A. Molony (collectively "Appellants") appeal the circuit court's reversal of the Board's denial of Arkay, LLC's (Arkay) application for a special use exception to operate a carriage horse stable. Appellants contend the court erred in (1) finding the special use exception ordinance described a stable as a "use" rather than a physical structure, (2) relying upon the law of horizontal property regime (HPR) as a means of satisfying the separation requirement, and (3) failing to reconcile and construe the zoning and tourism ordinances in a consistent manner. We reverse.

**FACTS/PROCEDURAL HISTORY**

Robert R. Knoth owns and operates Carolina Polo & Carriage Company (Carolina Polo), one of five franchised horse carriage tour businesses in Charleston, South Carolina. From 1990 to 1996, Carolina Polo's stable was located at 45 Pinckney Street in the historic City Market District. After losing its lease, Carolina Polo relocated to a building on the other side of the same block at 16 Hayne Street. From 1996 to 2009, another horse carriage company ran its business out of the 45 Pinckney Street location. In 2013, Carolina Polo lost its lease at 16 Hayne Street, but Knoth was able to purchase the prior location at 45 Pinckney Street. Knoth placed the property title in the name of Arkay, of which he is the sole member.

In the mid–1990s, the Charleston City Council (the Council) enacted legislation under its zoning code to regulate the horse carriage tour business in the city. Pursuant to section 54–206(p) of the City of Charleston Code of Ordinances (2015),

horse stables are permitted in general business and urban commercial zoning districts if they are granted a special use exception by the Board. The Board must grant a special use exception if it finds an applicant has met seven criteria, including when a stable is not located within 100 feet of a residentially zoned district. From the adoption of this legislation until 2009, 45 Pinckney Street—located within 100 feet of a residential district—operated as a nonconforming use under the City's zoning ordinances.

At the time of Arkay's purchase, the 45 Pinckney Street building no longer qualified as a nonconforming use because it was not used as a horse stable for more than three years between 2009 and 2013. Accordingly, in March 2013, Arkay applied for a special use exception to operate a stable at 45 Pinckney Street—a property zoned for general business—to house Carolina Polo's carriage horses. The Preservation Society of Charleston, the Historic Ansonborough Neighborhood Association, and several neighbors opposed the application. At the evidentiary hearing, Arkay conceded the frontage of the building at 45 Pinckney Street was within 93.5 feet of the closest residential district to the north. Arkay argued, however, that the separation requirement only applied to the use of stabling, not the physical structure.

To separate the "stabling activity" from the residential district, Arkay proposed an HPR to divide the building at 45 Pinckney Street into two units. In the southern rear portion of the building, Unit A would consist of six stalls in which the horses would be fed, groomed, and stored. In the northern front portion of the building, Unit B would contain two offices and be subject to an appurtenant easement for the benefit of Unit A for ingress and egress to Pinckney Street. Unit B would also be subject to a recorded covenant prohibiting the use of that space as a stable. Additionally, Units A and B would be separated in the middle of the building by a common area consisting of two tack rooms, two restrooms, an area for customer waiting, and an area for customer loading and unloading. Because its horse stalls would be located 119 feet from the nearest residential zone, Arkay contended the stabling activity complied with the zoning ordinance's separation requirement. Alternatively, Arkay applied for a *de minimis*

variance of 6.5%, arguing only half of the frontage of the building failed to meet the 100–foot requirement by 6.5 feet.

After hearing from Arkay, the zoning administrator, and other interested parties, the Board denied the application on June 4, 2013, finding the stable did not meet the 100–foot separation requirement. In reaching its decision, the Board rejected Arkay's argument that the ordinance described "stable" as a use and not a physical structure. The Board noted only one building occupies 45 Pinckney Street and the proposed HPR did not alter that circumstance. The east, west, and south sides of the building share common walls with neighbors, and the front of the building is flush with the sidewalk. While Arkay would store the horses in Unit A, the Board found the building contained only one access to a public street and the horses would have to pass through Unit B to reach Pinckney Street. Because Unit B and the proposed appurtenant easement were areas within 100 feet of a residentially zoned district, the Board held 45 Pinckney Street did not qualify as a site for a stable under the zoning ordinance. The Board also denied Arkay's application for a variance in a separate order on June 4, 2013.

Arkay subsequently appealed the Board's orders to the circuit court. The court issued an order on May 30, 2014,[1] and Appellants filed a Rule 59(e), SCRCP, motion to alter or amend judgment. In response, the court issued a corrected order dated June 19, 2014, reversing the Board's order denying Arkay's application for a special use exception. Through a plain reading analysis of section 54–206, the court held the zoning ordinance's separation requirement applied only to the use of stabling, not the physical structure. The court first noted section 54–206 is titled "[s]pecial exception *uses*" and regulates nineteen different uses of property that can qualify for special zoning exceptions. Accordingly, the court found that, with few exceptions, the special uses set forth in section 54–206 describe specific forms of activity.

Additionally, the court stated the requirements for a stable in section 54–206(p) focus on the use of the property as a horse carriage tour business, not the physical building. Noting section 54–206(p)(2) requires that "[t]he City of Charleston

1. This order was not included in the record on appeal.

Tourism Commission has issued a Certificate of Appropriateness for the stable," the court reasoned the certificate described in the City's tourism chapter is not issued for a stable, but rather for a horse carriage vehicle. Thus, the court found the certificate is an aspect of the "use" of the property in general. Similarly, the court found section 54–206(p)(4) prohibits the cleaning, loading, and tacking areas from impeding traffic flow in a public right of way and, therefore, is another regulation on the use of the property.

Most noteworthy, the court found section 54–206(p)(7) requires that "[b]uildings [be] designed utilizing appropriate ventilation to prevent objectionable odors from being emitted." In contrast, the court noted section 54–206(p)(1) only prohibits the "stable" from being located within 100 feet of any residentially zoned district, not the "buildings." Thus, the court found the Council only intended that the stabling activity and potentially obnoxious characteristics of housing horses be subject to the separation requirement.

The court also noted the city tourism chapter defines *stable* as "the barn where the animals are kept." In the urban context of downtown Charleston, the court reasoned the word *kept* means "preserved or maintained," which would be accomplished by Arkay's proposed HPR. Lastly, the court held the Board erred in measuring the distance of separation from the nearest residential district to the easement, instead of measuring it to the "use" as a stable. The court explained "the horses will no more be 'kept' on the access easement [than] they would be 'kept' on the streets of Charleston through which they come and go every day, and from which they enter 45 Pinckney Street." Because its reversal on the special use exception was dispositive, the court found it unnecessary to address the Board's order denying Arkay's application for a variance. This appeal followed.

**STANDARD OF REVIEW**

■ The appellate court gives "great deference to the decisions of those charged with interpreting and applying local zoning ordinances." *Gurganious v. City of Beaufort*, 317 S.C. 481, 487, 454 S.E.2d 912, 916 (Ct. App. 1995). This court will not reverse a zoning board's decision unless the board's findings of fact have no evidentiary support or the board commits

an error of law. *Charleston Cty. Parks & Recreation Comm'n v. Somers*, 319 S.C. 65, 67, 459 S.E.2d 841, 843 (1995). "[I]ssues involving the construction of an ordinance are reviewed as a matter of law under a broader standard of review than is applied in reviewing issues of fact." *Mikell v. Cty. of Charleston*, 386 S.C. 153, 158, 687 S.E.2d 326, 329 (2009). "The determination of legislative intent is a matter of law." *Somers*, 319 S.C. at 67, 459 S.E.2d at 843.

## LAW/ANALYSIS

Appellants argue the circuit court erred in finding the special use exception ordinance described a stable as a use rather than a physical structure. According to Appellants, in doing so, the court failed to reconcile and construe the zoning and tourism ordinances in a consistent manner. Moreover, Appellants contend the court erred in relying upon the law of HPR as a means of satisfying the separation requirement. We agree.

A governing body's "intent embodied in an ordinance 'must prevail if it can be reasonably discovered in the language used.' " *Clear Channel Outdoor v. City of Myrtle Beach*, 360 S.C. 459, 466, 602 S.E.2d 76, 79 (Ct. App. 2004) (quoting *Somers*, 319 S.C. at 67, 459 S.E.2d at 843). "An ordinance must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers." *Somers*, 319 S.C. at 68, 459 S.E.2d at 843. "In construing ordinances, the terms used must be taken in their ordinary and popular meaning." *Id.* "Moreover, it is well-settled that statutes dealing with the same subject matter are *in pari materia* and must be construed together, if possible, to produce a single, harmonious result." *Beaufort Cty. v. S.C. State Election Comm'n*, 395 S.C. 366, 371, 718 S.E.2d 432, 435 (2011).

The ordinance at issue in this case, section 54–206(p), provides the following requirements a stable must meet to receive a special use exception:

Stables shall be permitted within the GB and UC district as an exception where the Board, after review, finds that:

1. The stable is not located within 100 feet of any residential zone district.

2. The City of Charleston Tourism Commission has issued a Certificate of Appropriateness for the stable.

3. The stable complies with all city, county, and state regulations for stables.

4. A site plan is provided showing that the cleaning/loading/tacking area shall not impede traffic flow in a public right-of-way.

5. A written explanation is submitted detailing how refuse will be handled in accordance with city, county, state, and federal regulations. This shall be reviewed by the Department of Public Service.

6. A plan is submitted showing how drainage on the property is to be collected in accordance with city, county, state, and federal regulations. This shall be reviewed by the Commissioners of Public Works and the Department of Public Service.

7. Buildings are designed utilizing appropriate ventilation to prevent objectionable odors from being emitted.

At the outset, we note the ordinance's seven requirements do not describe "uses" of the property, but rather establish firm prerequisites on how the stable must be configured and how it must operate to receive a special use exception from the Board. Additionally, we disagree with the circuit court's finding that the Council made a relevant distinction between a stable and a building in section 54–206(p)(7) because a stable already comes under the definition of a building in the zoning code. *See* Charleston, S.C., Code of Ordinances § 54–120 (2015) (defining a *building* as "[a]ny structure built for the support, shelter, housing[,] or enclosure of persons, *animals*[,] or property of any kind" (emphasis added)). Thus, we find—and it seems all parties agree—that section 54–206(p)(1) applies the 100–foot separation requirement to a physical location. Consequently, our focus turns to whether the Council intended such physical location to mean a structure or the exact place where horses are kept.

"Stable" is not defined in the City's zoning code. *See* § 54–120. Section 54–206(p)(3), however, requires that stable operators abide by city regulations for stables. Thus, to further gauge legislative intent on what constitutes a stable, we must examine the City's tourism chapter, which provides for sub-

stantial regulation of horse carriage businesses operating in Charleston.[2] *See Beaufort Cty.*, 395 S.C. at 371, 718 S.E.2d at 435 (holding that "statutes dealing with the same subject matter are *in pari materia* and must be construed together, if possible, to produce a single, harmonious result").

Enacted in 2007, section 29–212 of the City of Charleston Code of Ordinances (2015) specifically focuses on the management of carriage horse businesses and differentiates between stables and stalls. Subsection 29–212(b)(12) defines *stable* as "the barn where the animals are kept." On the other hand, section 29–212(b)(13) defines *stall* as the "individual space within the barn where each animal is kept." Thus, stalls are a smaller component of the larger entity that is the stable.

In the case of 45 Pinckney Street, because the building that would keep the horses encompasses the entire lot, we find it is a barn for purposes of the ordinance. Even though the horses would be kept in the rear of the building—and would be separated from the street by areas for customers, tack rooms, restrooms, and offices—this does not change the building's status as a barn. Moreover, we find these areas and rooms in the front portion of 45 Pinckney Street are commonly associated with horse stables. The obnoxious elements—no matter how minimal in scope Arkay claims they will be—are still likely to accumulate in these areas and escape through the front gate abutting Pinckney Street, the building's only point of access.

Additionally, Arkay's proposed definition of *stable* as meaning only where the horses are kept essentially undermines a number of important provisions regulating stables. *See, e.g.*, Charleston, S.C., Code of Ordinances § 29–212(i)(1)(j) ("There shall be no smoking at any time in stables."); § 29–212(i)(3) ("All stables shall have a yearly inspection by the fire department."); § 29–212(i)(1)(i) ("Interior and exterior areas of the

---

**2.** On appeal, Arkay contends it is not appropriate to consider definitions in the tourism code as a part of the analysis because section 29–212(b) precludes their application to the zoning code providing that, "[e]xcept where the context clearly indicates otherwise, the following terms and phrases as used in this section shall have the following meanings." We disagree because the context of the relevant zoning and tourism sections is the regulation of horse carriage businesses in Charleston.

stable shall be kept clean, properly drained[,] and free of nuisances including, but not limited to, unreasonable and excessive odors and unreasonable accumulation of refuse and excreta."). Arkay's construction of *stable* would not prohibit smoking in 45 Pinckney Street's customer waiting, loading, and unloading areas that are directly adjacent to the horse stalls. Further, the fire department would only have to annually inspect the horse stalls instead of the entire building for fire hazards. Likewise, Arkay would only have to clean the horse stalls and the areas surrounding them, but not the sidewalk area on Pinckney Street. Accordingly, we find Arkay's interpretation leads to absurd results. *See Lancaster Cty. Bar Ass'n v. S.C. Comm'n on Indigent Def.*, 380 S.C. 219, 222, 670 S.E.2d 371, 373 (2008) (holding a court will reject an interpretation when it would lead to an absurd result that could not have been intended by the legislative body).

Based upon our review of the language of the relevant ordinances, we find the Council intended to apply the 100–foot separation requirement in subsection 54–206(p)(1) to a physical structure operating as a stable—such as the building at 45 Pinckney Street—and not merely to stalls that house the horses. The purpose of the various requirements of section 54–206(p) is to protect the health and safety of city patrons and carriage horses, while distancing the unwelcome elements of a barn, including noise, odors, waste, drainage, and pests from residential areas. The circuit court's finding that the ordinance describes the stable in subsection 54–206(p)(1) as a use, rather than a physical structure, runs afoul of the purpose for which the ordinance was enacted. Therefore, mindful of our deferential standard of review, we hold the circuit court erred in reversing the Board's denial of Arkay's application for a special use exception. *See Gurganious*, 317 S.C. at 487, 454 S.E.2d at 916 (noting the appellate court gives "great deference to the decisions of those charged with interpreting and applying local zoning ordinances").

■ Likewise, we find the circuit court erred in relying upon the law of HPR in holding Arkay satisfied the separation requirement.[3]

---

**3.** Arkay argues the circuit court did not rely upon its proposed HPR in holding that Arkay satisfied the 100–foot separation requirement. Arkay

 Under the South Carolina Horizontal Property Act,[4] an owner of real property may establish an HPR through the recordation of a master deed. *See* S.C. Code. Ann. § 27–31–30 (2007). A property's conversion to an HPR divides the owner-ship interest in the property but does not subdivide the land itself. *Penny Creek Assocs., LLC v. Fenwick Tarragon Apart-ments, LLC*, 375 S.C. 267, 274, 651 S.E.2d 617, 621 (Ct. App. 2007).

In our view, Arkay's proposed HPR for 45 Pinckney Street does not change the status of the building as a stable because it does not vertically subdivide the building itself. *See Penny Creek*, 375 S.C. at 274, 651 S.E.2d at 621 (concluding that, under an HPR, "the property and common areas remain intact and the owner merely grants a share of his ownership interest in these areas to purchasers"). Unit B, the easement, the tack rooms, the restrooms, and the customer areas would all be underneath the roof of the building, and the building is within 100 feet of a residentially zoned district. Therefore, we find the court erred in considering Arkay's proposed HPR for 45 Pinckney Street in reaching its decision.

## CONCLUSION

Based on the foregoing, because we find Arkay's proposed stable at 45 Pinckney Street failed to meet the separation requirement of subsection 54–206(p)(1), we hold the circuit court erred in reversing the Board's denial of Arkay's applica-tion for a special use exception to operate a carriage horse stable. Accordingly, the circuit court's order is

**REVERSED.**

HUFF, J., concurs.

---

contends the proposed HPR was simply a showing of good faith to the Board, as well as the public, that no horse stalls would be located in Unit B on the north end of the building within 100 feet of a residential district. We disagree, however, because the circuit court specifically mentioned the HPR in holding the Board erred in measuring the separation distance from the access easement instead of the stabling use. The court also acknowledged the proposed restrictive covenant for Unit B—which could only be accomplished through the proposed HPR—would prohibit horses from being kept in Unit B.

4. S.C. Code Ann. §§ 27–31–10 through –440 (2007 & Supp. 2015).

THOMAS, J., dissenting:

I respectfully dissent. I agree with the circuit court that the City of Charleston Board of Zoning Appeals erred in denying Arkay a special exception use permit.

This appeal involves the interpretation of section 54–206(p) of the City of Charleston Code of Ordinances (2015). The majority holds the circuit court erred in reversing the Board's denial of Arkay's application for a special use exception and bases this holding on (1) a deferential standard of review in deciding how to apply subsection 54–206(p)(1), under which a stable may operate as a special exception use in certain zoning districts if, among other criteria, "[t]he stable is not located within 100 feet of any residential zone district"; and (2) an examination of ordinances from the City of Charleston Tourism Ordinances. In reaching its decision, the majority finds the City Council intended to apply the 100–foot separation requirement to the building at 45 Pinckney Street, which, as the circuit court observed, is built on the "zero lot line" with its northern façade constructed flush with the sidewalk, rather than to the specific part of the building that would be used for Arkay's stable.

I agree with the majority that, as appellate tribunals, this court and the circuit court must "give great deference to the decisions of those charged with interpreting and applying local zoning ordinances." *Gurganious v. City of Beaufort*, 317 S.C. 481, 487, 454 S.E.2d 912, 916 (Ct. App. 1995). However, "[i]ssues involving the construction of ordinances are reviewed as a matter of law under a broader standard of review than is applied in reviewing issues of fact." *Mitchell v. City of Greenville*, 411 S.C. 632, 634, 770 S.E.2d 391, 392 (2015); *see also Mikell v. Cty. of Charleston*, 386 S.C. 153, 158, 687 S.E.2d 326, 329 (2009) ("Although great deference is accorded the decisions of those charged with interpreting and applying zoning ordinances, 'a broader and more independent review is permitted when the issue concerns the construction of an ordinance.'" (quoting *Eagle Container Co., LLC v. Cty. of Newberry*, 379 S.C. 564, 568, 666 S.E.2d 892, 894 (2008))).

I would interpret section 54–206(p) solely through common sense scrutiny of its plain language and would not resort to subordinate rules concerning the construction of statutes. *See*

*McClanahan v. Richland Cty. Council,* 350 S.C. 433, 438, 567 S.E.2d 240, 242 (2002) ("All rules of statutory construction are subservient to the one that legislative intent must prevail if it can reasonably be discovered in the language used, and that language must be construed in the light of the intended purpose of the statute."); *Hodges v. Rainey,* 341 S.C. 79, 85, 533 S.E.2d 578, 584 (2000) ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. Therefore, the courts are bound to give effect to the expressed intent of the legislature." (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.03 at 94 (5th ed. 1992)); *Rabon v. S.C. State Highway Dep't,* 258 S.C. 154, 157, 187 S.E.2d 652, 654 (1972) (stating the rule that statutes are to be construed in pari materia "may be applied where there is an ambiguity to be resolved and not where . . . the meaning of the statute is clear and unambiguous").

Although buildings where horses are kept are commonly referred to as stables, a stable is different from other buildings because of the activities that take place within it, namely, the feeding, sheltering, and care of domestic animals. To include other uses such office space, restrooms, or a customer waiting area as part of a stable merely because they are housed within the same physical structure is not supported by any grammatical analysis or by any construction of any provision of the Charleston City Code.

Particularly significant in the present case is the final requirement in section 54–206(p) to obtain special exception approval for a stable. This requirement reads as follows: "*Buildings* are designed utilizing appropriate ventilation to prevent objectionable odors from being emitted." Charleston, S.C. Code of Ordinances § 54–206(p)(7) (2015) (emphasis added). As the circuit court observed, the City Council, in using the word "building" when referring to a physical structure, "envisioned a physical circumstance such as is presented in this case, where the use of the property as a 'stable' is but one of several uses contained in a larger 'building.' " *See Davenport v. City of Rock Hill,* 315 S.C. 114, 117, 432 S.E.2d 451, 453 (1993) ("It is never to be supposed that a single word was inserted in the law of this [S]tate without the intention of thereby conveying some meaning."); *Nexsen v. Ward,* 96 S.C. 313, 321, 80 S.E. 599, 601 (1914) ("The rule sustained by all the

courts requires that every word, clause, and sentence must be given some meaning, force, and effect, if it can be done by any reasonable construction." (*quoted in Breeden v. TCW, Inc./ Tenn. Express*, 355 S.C. 112, 120 n. 7, 584 S.E.2d 379, 383 n. 7 (2003))).

Furthermore, the specific requirement in subsection 54–206(p)(7) that "[b]uildings [be] designed using appropriate ventilation to prevent objectionable odors from being emitted" shows a recognition that stables are likely to be located in buildings that are also used for other purposes. To impose such sanitation measures on an entire building in which a stable is located shows prudent consideration of the need to avoid undesirable consequences that could not be avoided if such measures were required only within the stable itself.

The majority correctly notes that subsection 29–212(b)(12) of the City of Charleston Code of Ordinances (2015) defines "stable" as "the barn where the animals are kept." As I have previously noted, it is not necessary to construe this ordinance together with section 54–206(p) with the objective of producing "a single, harmonious result." *Sloan v. S.C. Bd. of Physical Therapy Exam'rs*, 370 S.C. 452, 470, 636 S.E.2d 598, 607 (2006). Nevertheless, in response to the majority's reliance on parts of the City of Charleston Tourism Ordinances to support its holding, I note the definitions provided in section 29–212(b) apply only "as used in this section" and, even within this limitation, do not apply "where the context clearly indicates otherwise." Charleston, S.C. Code of Ordinances § 29–212(b) (2015).

Finally, notwithstanding the reference in the appealed order to the proposed horizontal property regime and the finding based on the regime plot plan that the 100–foot separation requirement was satisfied, I agree with the respondents that there was no need to create a horizontal property regime in order to obtain a special exception use permit. Rather, the purpose of the regime is to provide assurance to the City and the public that the physical space where the horses would be kept, i.e., the stable in Unit A, will be at least 100 feet from the nearest residential district and in compliance with section 54–206(p).

I would therefore affirm the appealed order.