# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Faye P. Croft, Personally and as Trustee of the James A. Croft Trust; James A. Croft Trust; William A. Harbeson; Heyward G. Hutson; James Stephen Greene, Jr.; South Carolina Public Interest Foundation; Summerville Preservation Society; and Dorchester County Taxpayers Association, individually, and on behalf of all others similarly situated, Appellants,

v.

Town of Summerville and Town of Summerville Board of Architectural Review, Respondents.

Appellate Case No. 2015-002199

―――――――――

Appeal From Dorchester County
Edgar W. Dickson, Circuit Court Judge

―――――――――

Opinion No. 5687
Heard February 15, 2018 – Filed October 9, 2019

―――――――――

**AFFIRMED**

―――――――――

Michael T. Rose, of Mike Rose Law Firm, PC, of Summerville, and W. Andrew Gowder, Jr., of Austen & Gowder, LLC, of Charleston, for Appellants.

G. Waring Parker, of G. Waring Parker Law Firm, LLC, of Summerville, and Timothy Alan Domin, of Clawson & Staubes, LLC, of Charleston, for Respondents.

―――――――――

**MCDONALD, J:**  This appeal addresses two decisions issued by the Town of Summerville Board of Architectural Review (the Board) in its consideration of a mixed-use development project proposed for downtown Summerville.  Appellants contend the circuit court erred by (1) considering new evidence submitted after Appellants appealed the Board's decisions, (2) failing to remand the case for the parties to develop a sufficient record, and (3) approving the decisions despite the Board's failure to adopt, develop, and comply with established rules of procedure as required by town ordinance.  Appellants further assert the Board's decisions lacked the necessary factual support, the Board held meetings in violation of the South Carolina Freedom of Information Act (FOIA),[1] and the Board erroneously issued a certificate of appropriateness for the project without considering public objections.  We affirm.

**Facts and Procedural History**

On July 9, 2014, the Town of Summerville and Town of Summerville Redevelopment Corporation entered into a public-private partnership agreement (the Agreement) with Applegate & Co. (the Developer) to develop 1.58 acres in downtown Summerville.  The proposed mixed use development (the Project), to be called "The Dorchester," included a conference center, parking deck, hotel, restaurant with rooftop bar, and condominiums.  The Developer subsequently applied to the Board for design approval.

At an October 6, 2014 Board meeting, Architect Hank D'Antonio presented the Project's conceptual plan.  D'Antonio explained that although some elements were not yet fully designed, he believed the design as a whole emulated the surrounding buildings of historic downtown Summerville and Summerville's other residential areas.  He emphasized the Developer sought only conceptual design approval at that point and would consider the Board's comments and concerns in rendering the final design.

The Board expressed concerns about the height, mass, and scale of the Project, specifically noting the proposed hotel seemed too large for the space.  In discussing the aesthetics of the Project, Board members contended the design did not "represent Summerville" and the hotel looked too much like a commercial building.  The Board took public comments, and the chairman explained that each speaker would be limited to three minutes.  Members of the public raised concerns

---

[1] S.C. Code Ann. § 30-4-10 to -165 (2007 & Supp. 2018).

similar to those of the Board, providing comments about mass, scale, height, aesthetics, and traffic. Although some commenters liked the overall concept of the Project, they expressed that modifications were needed to make the Project more compatible with downtown Summerville. Faye Croft, an appellant in this case, complained that people in the residential units would be able to look into her house. Ultimately, the Board chose not to vote at the October 2014 meeting; the chairman explained, "[T]his is not unusual . . . . [E]very large project that we've had in the Town of Summerville, we've gone through a series of meetings with the architect and developers to come up with a plan that works for Summerville."

The Board again discussed the Project at its November 3, 2014 meeting. In response to the concerns previously raised by the Board and the public, the Developer presented certain design changes, including the following alterations to the design of the hotel: a reduction in scale and height, modifications to the cornice, and changes to the top of the building. According to the Developer, the design of the Project as a whole was modified to achieve a more "residential feel."

Professional engineer Rick Reif presented a traffic study, which found "the location of [the] [P]roject meets all the applicable SCDOT standards for spacing along [the s]treet." Although the traffic study found the affected intersections would continue to "operate at an acceptable level of service," the Board expressed concern about the Project's potential impact on traffic.

The Board acknowledged the design improvements to the hotel were significant and more representative of the downtown area. However, it expressed continued concern about the height, mass, and scale of the residential units, specifically referencing Croft's comment that people in the residential units would be able to see into her home. Several members of the public spoke about the Project's impact on traffic and parking and agreed with the Board's concern that the proposed design for the residential units was incompatible with the historic area.

Referencing the Agreement, the Board reiterated that many of the traffic and parking concerns were not within its jurisdiction and recommended that concerned citizens contact the town council. The president of the Summerville Preservation Society raised questions regarding the demolition needs of the Project, which would require the demolition of an older home within the historic district. He preferred that the house be cleaned up, or in the alternative, moved. The Board deferred ruling, stating it was still in "the negotiating stage" with the Developer. Still, the Board encouraged the Developer to revisit the design to address the concerns raised at the meetings.

By a vote of five to one, the Board preliminarily approved the Project design at its January 5, 2015 meeting. Prior to the vote, the Developer noted it had again made significant changes to the Project. The Developer reported it had contracted to purchase a neighboring property—which would provide for an additional driveway—in an effort to allay traffic and parking concerns. The Developer explained the additional property also allowed it to address the height, mass, and scale objections to the Project by redesigning the conference center to one story and reducing the height of the residential units. The Board expressed concerns about the size and appearance of one large "block" building, but the Developer explained it was infeasible to break up the building because the parking garage was located behind it.

The Board also discussed demolition needs for the Project and approved demolishing an old gas station. The Developer advertised four other structures it proposed to demolish so interested parties could move the structures elsewhere, as one property owner proposed to do. However, the Developer had not received commitments from anyone to move the structures, and two different companies found this would be very difficult to accomplish. The Developer agreed, upon the Board's suggestion, to contact salvage companies to inspect the structures for the purpose of saving historic materials and to have two of the structures inspected for potential relocation. The Board did not take public comment at this meeting.

The Board approved demolition of the structures upon final approval of the Project at a January 12, 2015 meeting. The Board emphasized there would be an ongoing opportunity for the structures to be moved and materials to be salvaged.

At its April 6, 2015 meeting, the Board discussed concerns about siding and window materials, the transition area between the residential units and hotel, and the overall design of the project. The Board also raised questions about the materials and colors used for the exterior, particularly the use of HardiePlank siding and vinyl windows. The Developer agreed to build a wall sample and allow the Board to inspect the color samples once the Project was built, but prior to painting it. The Board disagreed about whether it should require the Developer to create a scale model. At the close of the April meeting, the Board gave the Project conditional final approval, subject to the Board's further review of the exterior materials and color, by a vote of five to one. Appellants petitioned the circuit court for review of the Board's decision on May 5, 2015.

The Board gave the Project final approval at its May 11, 2015 meeting, again by a vote of five to one. The Developer presented a revised design based on the concerns raised at the April meeting. When members of the public again questioned the Project's use, the chairman explained, "The zoning is B-3. I have no control over that . . . it's been that way for a long time." Another Board member moved for a vote stating,

> I move that we proceed with the final approval based upon the fact that we did conditional final approval. And I feel that the contractor—or the [D]eveloper has answered the questions we asked him to answer and provided us with material choices that we asked him to deliver to us.

One Board member explained, "I did have some initial issues about the plan, but all those were answered by the architect tonight." On May 22, 2015, after the Board issued a certificate of appropriateness for the Project, Appellants again petitioned the circuit court for review.

The Board adopted an order setting out its findings of fact and conclusions of law at its August 3, 2015 public meeting. The Board found the Project was "appropriate in terms of aesthetics, design, architecture, height, mass, scale, proportion, arrangement, texture and material, and is compatible with the general character of its immediate neighborhood within the historical district of the Town of Summerville." The Board also filed a memorandum in opposition to Appellants' petitions on August 3, 2015. On August 5, 2015, the Board filed and served a certified copy of the Board proceedings, which included a transcript of matters heard before the Board as well as the Board's decision adopting its findings of fact and conclusions of law.

After hearing arguments, the circuit court affirmed the Board's April 6, 2015 and May 11, 2015 decisions.[2]

**Standard of Review**

"The appellate court gives 'great deference to the decisions of those charged with interpreting and applying local zoning ordinances.'" *Arkay, LLC v. City of*

---

[2] The circuit court consolidated the appeals by consent order.

*Charleston*, 418 S.C. 86, 91, 791 S.E.2d 305, 308 (Ct. App. 2016) (quoting *Gurganious v. City of Beaufort*, 317 S.C. 481, 487, 454 S.E.2d 912, 916 (Ct. App. 1995)).  "The appellate court is not free to substitute its judgment for that of the [Board].  Accordingly, we will not reverse the circuit court's affirmance of the [Board] unless the [Board's] findings of fact have no evidentiary support or the [Board] commits an error of law."  *Gurganious*, 317 S.C. at 487, 454 S.E.2d at 916.

**Law and Analysis**

**I.  Board's Order and Sufficiency of the Record**

Appellants argue the circuit court erred in requesting and considering the Board's findings and conclusions because the Board's order was not prepared and approved until after Appellants had petitioned the circuit court for review of the Board's oral decisions.  Similarly, Appellants contend the circuit court erred in considering the Board's meeting minutes because the minutes were not approved until the Board's August 2015 meeting, after Appellants had appealed the April and May decisions.  Appellants further argue the circuit court should have remanded the case for rehearing if it believed the record was insufficient.  Finally, Appellants argue the Board's decision lacks factual support.  We disagree.

Section 6-29-870(A) of the South Carolina Code (2004) authorizes a local government to create a board of architectural review when it has enacted a zoning ordinance related to "the preservation and protection of historic and architecturally valuable districts and neighborhoods."  "The board of architectural review has those powers involving the structures and neighborhoods as may be determined by the zoning ordinance."  S.C. Code Ann. § 6-29-880 (2004).

> The findings of fact by the board of architectural review are final and conclusive on the hearing of the appeal, and the court may not take additional evidence.  In the event the judge determines that the certified record is insufficient for review, the matter must be remanded to the board of architectural review for rehearing.  In determining the questions presented by the appeal, the court must determine only whether the decision of the board is correct as a matter of law.

S.C. Code Ann. § 6-29-930(A) (Supp. 2018).

The duty of the Board is "to promote the purposes and objectives of this article [addressing historic preservation] through the review of plans and applications, as provided in this article, for all construction within the historic districts or historic properties, including both modifications to existing buildings, demolition and construction of new buildings."  Summerville, S.C., Code of Ordinances § 32-176(f).  The purpose of Summerville's historic preservation ordinances

> is to protect, preserve and enhance the distinctive architectural and cultural heritage of the town; to promote the educational, cultural, economic and general welfare of the people of the town; to foster civic pride; to encourage the harmonious, orderly and efficient growth and development of the municipality; to ensure that new buildings and developments will be harmonious with the existing structures and sites; and to establish a mechanism for accomplishing these objectives.

Summerville, S.C., Code of Ordinances § 32-172(a).

> It shall be the duty of the board of architectural review to make the following determinations with respect to the historic districts or historic properties:
>
> > (1) Appropriateness of altering, moving or demolishing any designated building or structure within a designated historic district. The board shall consider the historic, architectural and aesthetic features of buildings, their relationship and importance to the district.
> >
> > (2) Appropriateness of exterior architectural features[,] including signs and other exterior fixtures of any new buildings and structures to be considered within the historic district.
> >
> > (3) Appropriateness of exterior design of any new extension of any existing building or structure within the historic district.

(4) Appropriateness of the general exterior design, scale, proportion, arrangement, texture, and material of the building or structure in question and the relation of such factors to the street scene and to similar buildings in the immediate vicinity. The board's concern shall be exterior features so that they will be compatible with the general character of their immediate neighborhood and preserve the existing street scene. The board shall have the right to review and approve colors of structures in the historic district and shall develop guidelines for the administration of the section. The board shall not make requirements as to the use of structures as long as this use in not in violation of existing zoning requirements.

(5) Appropriateness of site development features including driveways, fences, outbuildings or other site appurtenances.

(6) It shall be the duty of the board of architectural review to follow the established guidelines governing modifications, rehabilitations, additions and new construction within the boundaries of the town historic districts or historic properties.

Summerville, S.C., Code of Ordinances § 32-176(h).

Upon receiving the completed application [for a certificate of appropriateness], the board shall consider, among other things, the historic, architectural and aesthetic features of the building, the nature and character of the area or any new design or addition as stated in the application. In passing upon the application, the board shall consider the general design scale, proportion, material and setback of the building or structure in question or proposed building or addition as more completely defined in subsection 32-176(h) and the relation of such factors to the surrounding area.

Summerville, S.C., Code of Ordinances § 32-181(c)(4).

The discretion of a board of architectural review to approve proposed construction is "constrained only by reasonableness and good faith." *Seabrook Island Prop. Owners Ass'n v. Marshland Tr., Inc.*, 358 S.C. 655, 662, 596 S.E.2d 380, 383 (Ct. App. 2004) (quoting *River Hills Prop. Owners Ass'n v. Amato*, 326 S.C. 255, 259, 487 S.E.2d 179, 181 (1997)). Decisions from a board of architectural review are appealed to the circuit court. S.C. Code Ann. § 6-29-900(A) (Supp. 2018).

> Upon filing of an appeal with a petition as provided in Section 6-29-900(A) . . . the clerk of the circuit court must give immediate notice of the appeal to the secretary of the board and within thirty days from the time of the notice, the board must file with the clerk a duly certified copy of the proceedings held before the board of architectural review, including a transcript of the evidence heard before the board, if any, and the decision of the board including its findings of fact and conclusions.

S.C. Code Ann. § 6-29-920(A) (Supp. 2018).

"Generally, the format of a final decision is immaterial as long as the substance of the decision is sufficiently detailed so as to allow a reviewing court to determine if the decision is supported by the facts of the case." *Vulcan Materials Co. v. Greenville Cty. Bd. of Zoning Appeals*, 342 S.C. 480, 494, 536 S.E.2d 892, 899 (Ct. App. 2000) (rejecting a document purporting to set forth a zoning board's findings where the document's stated findings differed materially from findings reached during the hearing of the matter); *see also Wyndham Enterprises, LLC v. City of N. Augusta*, 401 S.C. 144, 149, 735 S.E.2d 659, 662 (Ct. App. 2012) (explaining that usually a board's minutes constitute its final findings; however, a transcript can constitute final findings if the minutes are found invalid).

Our appellate courts have not addressed the statutory requirements for decisions of boards of architectural review. However, in the context of zoning appeals, this court has held that a transcript can constitute a board's decision under certain circumstances. *Austin v. Bd. of Zoning Appeals*, 362 S.C. 29, 35, 606 S.E.2d 209, 212 (Ct. App. 2004). In *Austin*, which involved the denial of an application for a building permit, the board of zoning appeals rendered its decision by letter—in one sentence. *Id.* at 34, 606 S.E.2d at 212. The applicant argued the letter did "not

satisfy the statutory requirement that the board's decision be in writing with findings of fact and conclusions of law separately stated." *Id.* This court found no reversible error because "it is well-settled that courts reviewing the decisions of zoning boards and other administrative agencies may look to written documents as well as records of proceedings as sufficient formats for final decisions." *Id.* The court explained the evidence the board considered was "clearly laid out in the transcript of the hearing," which, when read together with the letter, provided a sufficient basis to determine whether the board's decision had factual support. *Id.* at 35, 606 S.E.2d at 212.

In *Massey v. City of Greenville Board of Zoning Adjustments*, this court held that a document titled "Findings of Fact and Conclusions" could not constitute the zoning board's final decision because only two of the five board members had seen the document. 341 S.C. 193, 200, 532 S.E.2d 885, 888 (Ct. App. 2000). As the hearing transcript was also inadequate, the matter was remanded to the board of zoning appeals to promulgate and ratify written findings of fact and conclusions of law before providing written notice of its decision to the applicant. *Id.* at 201, 532 S.E.2d at 889.

Appellants contend the circuit court erred in considering the Board's findings of fact and conclusions of law because the Board's order was prepared and approved after Appellants filed their circuit court appeal. We disagree because the Board properly voted and ratified its order at its August 2015 meeting. Thus, this situation differs from that in *Massey*, in which only two board members considered the document at issue. And, significantly, the record here—specifically the hearing transcripts—provides factual support for the Board's decision. *See Austin*, 362 S.C. at 34, 606 S.E.2d at 212 ("[I]t is well-settled that courts reviewing the decisions of zoning boards and other administrative agencies may look to written documents as well as records of proceedings as sufficient formats for final decisions."). The evidence indicates the Board considered all of the factors it was required to weigh in reviewing the Project's applications, including "general design scale, proportion, material and setback of the building or structure in question or proposed building." Summerville, S.C., Code of Ordinances § 32-181(c)(4).[3]

---

[3] As to Appellants' request for remand, the circuit court explained: "Appellants argue that the Court should not consider the written BAR order prepared after the filing of the appeal and yet also argue the record contains inadequate findings for review. Appellants suggest the matter be remanded for the Board to prepare another order. The Court rejects this position. The statute governing BAR appeals allows the Court to remit the matter so an order with findings of fact and law can

At the October 6, 2014 meeting, the Board expressed concerns about the height, mass, and scale of the Project, noting the hotel seemed too large for the space. The Board addressed additional aesthetics, specifically its concerns that the Project's design was not representative of downtown Summerville and the hotel looked too much like a commercial building. After the Developer presented a revised design at the November meeting—and the Board acknowledged the design had improved—the Board raised concerns about the height, mass, and scale of the residential units. At the January 5, 2015 meeting, the Developer's representative reported it had a contract to acquire additional property to alleviate Board concerns that the Project was too large for the space. The Developer presented further revised plans, and the Board continued to raise its—and the community's—concerns about the mass of the Project in that it consisted of one long blockish structure. Again, the Developer revised the design, presenting a new design at the Board's April 6, 2015 meeting. Even then, the Board took issue with the Project proposal, this time with respect to the building materials to be used and the proposed transition from the commercial section of the Project to the residential area. The Board gave only conditional approval, pending further review of the exterior materials and colors to be used on the Project.

At the May 11, 2015 meeting, the Developer again presented a revised design in an effort to address the Board's concerns. The Developer and the Board extensively discussed the exterior materials, and the Developer brought material samples for the Board to examine. Board members explained the Developer had addressed their concerns and approved the Project by a vote of five to one. Ample evidence establishes the Board considered exactly the factors required by the ordinance through its extensive discussions at the various meetings about the Project's mass, scale, height, and exterior materials. *See* S.C. Code Ann. § 6-29-930(A) ("In determining the questions presented by the appeal, the court must determine only whether the decision of the board is correct as a matter of law."); Summerville, S.C., Code of Ordinances § 32-176(h) (instructing the Board to consider factors such as the "[a]ppropriateness of the general exterior design, scale, proportion, arrangement, texture, and material of the building or structure in question and the relation of such factors to the street scene and to similar buildings in the immediate vicinity" in reviewing an application for new construction).

be prepared. S.C. Code Ann. § 6-29-930. However, the Court cannot find any reason why it should remand to the Board with directions to prepare an order when it has already done so. There is nothing in the statutes prohibiting the BAR from preparing an order after the notice of appeal is filed."

Throughout this process, Appellants worked to defeat the Project, but—as the Board's chairman repeatedly explained—because the property was zoned for the proposed business uses, Summerville's own ordinance prevented the overreach Appellants sought from the Board. *See* Summerville, S.C., Code of Ordinances § 32-176(h)(4) ("The board shall not make requirements as to the use of structures as long as this use in not in violation of existing zoning requirements."). There is no evidence the Board acted unreasonably or in bad faith in approving the Project's design, and the record supports the Board's findings. *See Seabrook Island Prop. Owners Ass'n*, 358 S.C. at 662, 596 S.E.2d at 383 (providing the Board's discretion in approving proposed construction is "constrained only by reasonableness and good faith"). Therefore, the circuit court properly affirmed the Board's decisions.

## II.  Compliance with the Freedom of Information Act

Appellants contend the Board violated South Carolina's FOIA by (1) holding secret meetings about the Project, (2) not properly keeping or immediately publishing meeting minutes, (3) not notifying members of the public that they would have an opportunity to speak at the meetings, (4) placing unreasonable restrictions on the public's right to comment at meetings, and (5) deliberately withholding relevant information from the public. We disagree.

"Every meeting of all public bodies shall be open to the public unless closed pursuant to § 30-4-70 of this chapter." S.C. Code Ann. § 30-4-60 (2007). "'Meeting' means the convening of a quorum of the constituent membership of a public body, whether corporal or by means of electronic equipment, to discuss or act upon a matter over which the public body has supervision, control, jurisdiction or advisory power." S.C. Code Ann. § 30-4-20(d) (2007). "'Quorum' unless otherwise defined by applicable law means a simple majority of the constituent membership of a public body." S.C. Code Ann. § 30-4-20(e) (2007).

"No chance meeting, social meeting, or electronic communication may be used in circumvention of the spirit of requirements of this chapter to act upon a matter over which the public body has supervision, control, jurisdiction, or advisory power." S.C. Code Ann. § 30-4-70(c) (2007). Summerville's own town ordinance provides,

> Upon receipt of an application to demolish a structure, the secretary to the board shall publish a display advertisement in a newspaper of general circulation in the town at least 14 days before the meeting informing

the public that such application has been received, detailing the date, time and place of the meeting at which it will be considered and stating the public will have an opportunity to comment at such meeting. In addition, any group or organization which requests in writing to the secretary that they be informed of any demolition applications shall be sent a notice in the form of a letter to the address provided by the organization to the secretary.

Summerville, S.C., Code of Ordinances § 32-182(b).

In July 2014, the Developer held a series of "workshops" with members of the Board to discuss the Project. In an email to the Board, a Town employee reminded members that two members would meet with the Developer at a time so there would be "no possibility of it looking like a quorum." In December 2014, the Developer held workshops with three Board members at a time. The Town employee again reminded Board members, "To avoid any possibility of a quorum (as this is not a public meeting), please stay within your agreed time frame."

We acknowledge the problematic nature of these emails and note that "workshops" should not be used to circumvent FOIA requirements. However, we find these workshops between Board members and the Developer did not constitute "meetings" under the plain language of our FOIA statutes. *See* S.C. Code Ann. § 30-4-20(d). As defined, a "meeting" specifically requires the presence of a quorum. There is no evidence a quorum was present during any of the workshops. *Id.*

Nor were the workshops violative of § 30-4-70(c)'s "chance meeting" prohibition as it is clear from the minutes and transcripts of the Board meetings that the Board did not "act upon" the matter of the Project—or any other matter within the Board's purview—during these workshop sessions. Significantly, all six public meetings about the Project took place after the July workshops, and the Board held four public meetings after the December workshops. The Developer continually revised its plans throughout the consideration process in response to concerns raised by the Board and the public's comments; it then presented these revised plans at subsequent Board meetings—where the Board took additional public comment. The meeting transcripts and minutes reflect the Board took public comment at no less than four meetings during its consideration of the Project.

Contrary to Appellants' claim, our FOIA does not require the Board to *immediately* publish meeting minutes. Rather, the FOIA requires the Board to publish its minutes within a reasonable time. *See* S.C. Code Ann. § 30-4-90(a) (2007) ("All public bodies shall keep written minutes of all of their public meetings."); S.C. Code Ann. § 30-4-90(b) (2007) ("The minutes shall be public records and shall be available within a reasonable time after the meeting except where such disclosures would be inconsistent with § 30-4-70 of this chapter."). Here, the Board's process was to approve a meeting's minutes at the next convened meeting. This is the standard practice for governing bodies across the State, and Appellants have failed to demonstrate this process is unreasonable or otherwise statutorily violative.

Likewise, we find Appellants' argument that the Board unreasonably restricted the public's right to comment at meetings is without merit. Specifically, Appellants challenge the time limit placed upon individual commenters at hearings and argue the Board unreasonably moved one meeting from council chambers to the Town Hall hearing room, contending "there were far too few seats to accommodate the number of people crowded into the second-floor hearing room of the Town Hall." But nothing in our FOIA statutes nor Summerville's own ordinances and regulations prohibited the Board from holding the meeting in the hearing room. Clearly, members of the public still attended the January meeting despite the challenged room change. *See Wiedemann v. Town of Hilton Head Island*, 344 S.C. 233, 240, 542 S.E.2d 752, 755 (Ct. App. 2001) (holding a town council's three-day, out-of-town workshop did not violate the FOIA because the town's "interest in increased attention and focus outweighed the small cost and delay to the public in attending the workshop"). Moreover, the applicable statutes and regulations do not require that a government body allow the public unlimited speaking time or discussion of matters outside the body's jurisdiction. One can easily anticipate the problematic results of such a requirement.

We also find Appellants' argument that the Board did not notify the public of the opportunity to comment on demolition to be without merit. Although Appellants contend the newspaper advertisements announcing Board meetings did not state the public would be allowed to comment on the proposed demolition, the evidence in the record indicates otherwise. At least one of the advertisements provided in the record announced the Board would be meeting on May 11, 2015 at 6:00 p.m.; stated the Board would "hear the final approval request for demolition of all existing structures" listed by tax map number in the ad; and noted the Board would "accept public comment." And, a December 2014 advertisement in The Summerville Journal Scene announced "Free Houses in Summerville!!!" in an

effort to encourage relocation of two "beautiful historic houses" slated for demolition.

Appellants' other complaints of lack of notice are similarly without merit. In addition to advertisements in the local newspaper of upcoming Board meetings, Summerville's planning department sent courtesy notice letters to property owners surrounding the Project. These letters, sent one week before each meeting, notified potentially affected citizens of upcoming meetings and informed property owners that the Project's application materials were available for review online. The record establishes that the Board received applications for new construction at least seven days before the next regularly scheduled meeting, as required by ordinance. *See* Summerville, S.C., Code of Ordinances § 32-181(c)(6) (requiring applications for new construction to be submitted to the Board's secretary at least seven days prior to the next regularly scheduled meeting). Appellants have failed to provide any evidence to the contrary, other than noting the lack of a stamped date of receipt on the applications, which we find insufficient to show error. *See Solley*, 397 S.C. at 214, 723 S.E.2d at 608 ("[T]he appellant has the burden of providing an adequate record on appeal."); Rule 210(h), SCACR (T]he appellate court will not consider any fact which does not appear in the Record on Appeal.").

Appellants also contend the Board unreasonably restricted access to the Developer's applications because the Town required that they file a FOIA request to view the documents. The circuit court did not rule on this question, and no Rule 59(e) motion was filed. Thus, this issue is unpreserved. *See Elam v. S.C. Dept. of Transp.*, 361 S.C. 9, 24, 602 S.E.2d 772, 780 (2004) (in order for an issue to be properly preserved for appeal, it must have been both raised to and ruled upon by the trial court). In any event, the Town's response was consistent with State law, and we find no Freedom of Information Act violation. *See* S.C. Code § 30-4-30 (addressing the right of the people to access and inspect the public records of a public body and setting out the procedure for a public body's response to such a records request).

### III. Adoption of Procedures

Appellants next argue the circuit court erred in affirming the Board's decisions because the Board failed to adopt and adhere to acceptable rules of procedure and failed to provide a specific rule defining "conceptual" or "preliminary" approval. Appellants further assert the Board failed to comply with relevant ordinances in receiving and acting upon the Developer's various applications. We disagree.

While Appellants correctly argue S.C. Code § 6-29-870(D) requires that a board of architectural review "shall adopt rules of procedure in accordance with the provisions of any ordinance adopted pursuant to [the South Carolina Local Government Comprehensive Planning Enabling Act of 1994]," they have provided no evidence to support their claim that the Board failed to do so. Indeed, the record and Summerville's Code of Ordinances establish otherwise. *See e.g.*, Summerville, S.C., Code of Ordinances § 32-174 (discussing the creation, membership and composition of the Board, terms of office, and duties of the Board); § 32-175 (providing for regular and special meetings, requiring that the Board shall adopt rules of order and keep minutes, and setting out additional powers and duties).

The record reflects that in addition to the rules set forth by ordinance, the Board conducted its business pursuant to general parliamentary procedure, according to the order of business explained by the chairman at the beginning of Board meetings. For example, prior to discussion of the Project at the Board's October 6, 2014 public meeting, the chairman explained:

> Although we are not required to solicit comments from anyone other than the applicant and the board members, we have chosen based on the great interest expressed both for and against this project to allow others to express comments that might help influence our decision making. For this purpose, we place a sign-in sheet down below, and we will call you in the order that you signed in.

Although Appellants contend the Board's rules on public comment were inconsistent, the chairman of the Board explained the comment procedure, including the three-minute limit, prior to the public comment periods. Several of the Board's sign in sheets have "3 minute limit" printed at the top. At times, the chairman had to remind those commenting that the Board had no power to change the B-3 general business zoning of the area or to venture into those areas subject to town council—not Board—authority.

As Appellants have failed to support their position that the Board unreasonably restricted public comment, lacked appropriate rules of procedure, or prejudiced their opposition to the Project through its conduct of the public meeting process, we affirm the circuit court's findings on these issues. *See Snyder's Auto World,*

*Inc.*, 315 S.C. at 186, 434 S.E.2d at 312 ("The burden is on the appellant to show not only error, but also prejudice.").[4]

## IV.  Certificate of Appropriateness and Validity of the Agreement

Appellants argue the Board erroneously issued a certificate of appropriateness based on an unqualified development application.  Appellants further contend the Board erred in considering the Project design because the public-private partnership Agreement was illegal and the applicants failed to submit the final design to the Redevelopment Corporation for review and approval.  As the circuit court did not consider and rule upon this question, it is not properly before us.[5]  *See Elam v. S.C. Dept. of Transp.*, 361 S.C. 9, 24, 602 S.E.2d 772, 780 (2004) (in order for an issue to be properly preserved for appeal, it must have been both raised to and ruled upon by the trial court).

## Conclusion

Based on the foregoing, we affirm the circuit court's order affirming the challenged Board decisions.

**AFFIRMED.**

**HUFF and GEATHERS, JJ., concur.**

---

[4] The circuit court aptly noted that many of Appellants' grounds for appeal, "such as issues related to the Town's request for proposal process or to the funding for the project, were matters beyond the purview of the Board and accordingly would have been inappropriate for the Board's or this Court's consideration."  Appellants have raised similar issues before this court, along with matters they did not raise before the circuit court and arguments for which there is no support in the record.

[5] Appellants have challenged the validity of the Agreement in a separate civil action, and this court previously ordered Appellants to strike from their designation of matter items relating only to the challenge of the Agreement because these items were part of the record in the separate action before the circuit court.  *See* Rule 210(c), SCACR ("The Record, shall not, however, include matter which was not presented to the lower court or tribunal).